SAMUEL BLATTNER, Administrator, etc., Plaintiff in Error, *v.* MARTIN WEIS *et al.,* Defendants in Error.

ERROR TO MADISON.

Where the court is satisfied that a will is a forgery, any attempt to make probate of it, will be defeated.

The declarations of the sole legatee under a will, are proper evidence to show that it is a forgery.

MAY 1st, 1856, Samuel Blattner presented affidavit of the death of Leanhart Weber, late of Canton Glaras, Switzerland, who died December 16th, 1854, while *en route* to Highland, Madison county, Illinois, leaving a will.

And thereupon the court having considered the testimony of Christian Heiman and Samuel Heiman, two subscribing witnesses to the paper purporting to be the last will and testament of Leanhart Weber, deceased, as contained in the depositions of said witnesses, taken by virtue of a commission theretofore issued by the clerk of said court, and filed March 24th, 1856, ordered that said last will and testament be declared proven according to law, and that the same be filed and recorded in said court as the last will and testament of said Leanhart Weber, deceased; thereupon said Blattner presented affidavit of the value of property of deceased; and thereupon letters of administration with the will annexed, issued out of said County Court to said Samuel Blattner.

May 16th, 1856, defendant in error appealed to Circuit Court of said Madison county, Illinois.

Madison Circuit Court, May term, 1857, this cause was heard by Judge SNYDER, without a jury.

Testimony of *Christian Heiman* and *Samuel Heiman;* de-

positions taken on *dedimus* issued from County Court aforesaid:

1st. Both witnesses testify that they, with the two Webers and Catharine Marti, in December, 1854, crossed the Atlantic, and landed at New Orleans, and while ascending the Mississippi river together on a steamer, Casper Weber died suddenly; the next day Leanhart Weber took sick, and said it had been his brother Casper's intention, if he had lived to arrive at the end of their journey, to have married Catharine Marti; said Casper had told them the same before he died; as soon as Leanhart was taken sick, he drew up the will in favor of Catharine Marti, and had witnesses to witness the same.

2nd. Said witnesses were personally acquainted with Leanhart Weber, the testator named in the will attached to dedimus, in his lifetime.

3rd. Saw the said Leanhart Weber sign the annexed last will and testament, and heard him declare the same to be his free act and deed.

4th. Said Leanhart Weber, at the time of signing said last will and testament, was, to all appearances, of sane mind and memory. Samuel Heiman further testifies, that he drew up said last will and testament of said Leanhart Weber, deceased, at his request, and according to his dictation and instruction; and that he regarded him at the time, and still regards him as being at the time, fully at his proper understanding, both in mind and memory.

5th. Did not perceive or discover any improper influence exerted over said Leanhart Weber, to induce him to sign said will and testament.

6th. Witnesses signed said last will and testament as subscribing witnesses thereto, in the presence of and at the request of said Leanhart Weber.

7th. Witnesses know nothing touching the due or proper execution of said will and testament, not necessarily elicited by the foregoing interrogatories.

8th. *Jacob Marti* testified, that he was acquainted with Leanhart Weber and Casper Weber, formerly of Glaras Canton, Switzerland; knows they held their property jointly; inherited it from parents; knows they sold their effects in Switzerland, and purchased a draft on a house in this country with the money, said draft payable to Casper and Leanhart Weber; saw the draft himself, and knows it was to both the Webers; knows they put their clothes in a trunk belonging to both Webers, and had it labeled the brothers Weber; knows that with said trunk and clothes and draft they left Switzerland for Highland, in Madison county, Illinois, in company with Catharine Marti.

*Cross-examined.* Catharine Marti is the daughter of witness, and claims as legatee under the will; witness resided in Canton Glaras, Switzerland, before he came to this country, last March, one year ago; did not see any will in Switzerland, but had a copy of a will which was in court about six months; a man by the name of Frederick Kaunn presented said will to the court in Switzerland; witness himself did not present any will.

Stated, upon being shown the will on file and asked if he had ever seen that will in Switzerland, that he never saw that will in Switzerland, but that he knew the signature to the will; that it was Leanhart Weber's signature; that he knew it well.

*Peter Blumer*, for plaintiff, testifies that Martin Weis told him that the trunk and clothes of the two Webers had come to Esquire Suppiger's, in Highland, Madison county, Illinois.

It is agreed the draft for about eleven hundred dollars, the property of the Webers, came to Highland, Madison county, Illinois.

Plaintiff then closed his case.

Defendant, Weis, then produced *Molina Vogel* and *George Weis*, to testify as to what Catharine Marti had said. Thereupon they testify that said Catharine told them that the two Webers died on the Mississippi river, on their way up from New Orleans, when three or four days out from New Orleans; that they never got to Highland; that Casper died one day first; that she got a draft belonging to the brothers Weber after their death, in hunting up their things; that when she got to St. Louis she and the two men tried to sell the draft, but could not; and that if they had sold it she meant to go up the river with those men, and not come to Highland; that she had been a woman long enough; that when they could not sell the draft, those men made the will in St. Louis; Catharine Marti said she was affianced to Casper Weber.

George Weis further testified, that he was the son of Martin Weis, and nephew, by his mother, of the Weber brothers; his mother's name is Ferina Weis; that he does not live at home with his father, and is not there very often; that on one occasion, when he was there, he heard the conversation above detailed; and, further, says Catharine did not tell the names of the two men, but stated that they went up the river from St. Louis; does not know certainly what men or what will was meant, but supposed that it was the will of the Weber brothers, as they were talking about them at the time; he talked at that time about an hour with said Catharine; it was the first time he had seen her, but he has seen her since, and knows it was Catharine Marti, because they called her by that name; that his mother and a brother in Switzerland are the only brothers and sisters

left by the said Webers ; he also said, Catharine said the Webers were single men and left no children.

*Peter Blumer*, re-called to impeach the character of Molina Vogel, says he knows her reputation for truth and veracity; that it is not worth much; that he would not believe her on oath.

*Charles Vogel*, called for the same purpose, says he knows her reputation for truth and veracity; that it is not good; says he supposes he would have to believe her on oath, but he would not think much of her testimony.

*Anthony Suppiger*, called to sustain the character of Molina Vogel, testifies that he is acquainted with the character of Molina Vogel among her neighbors for truth and veracity ; that he believes it to be good, and that he never heard anything against it, and that he would believe her under oath ; witness says he lives half a mile from Highland, where the witness resides.

*Jacob Casher*, called for the same purpose, says he is acquainted with the character of Molina Vogel among her neighbors for truth and veracity; that he never heard anything against her character, and from his knowledge of her character for truth and veracity, he would believe her under oath.

It was adjudged and determined in the Circuit Court, SNYDER, Judge, presiding, that the will was not probatable in said Madison county, Illinois ; and that the order of the County Court, probating the same, and determining said will to be sufficiently proven, be reversed.

Errors assigned :

1st. In deciding that said will is not probatable in Madison county, Illinois.

2nd. In deciding that said will is not sufficiently proven.

3rd. In allowing the testimony of Molina Vogel and George Weis, as to what Catharine Marti said about the will.

4th. For reversing the order of the County Court of Madison county, Illinois, in the premises.

J. D. MANNERS, for Plaintiff in Error.

J. and D. GILLESPIE, for Defendants in Error.

CATON, C. J. We are so entirely satisfied that the pretended will is a forgery, that we do not deem it necessary to consider the question, whether it could be probated in Madison county, if genuine. We do not reach that point in the investigation.

The first question which we shall examine is, whether Catharine Marti's declarations were admissible to prove that the

17

Blattner *v.* Weis et al.

will was a forgery. She is the sole legatee in the will, and the only person on earth who can have the least possible interest in sustaining it. It would be strange indeed, if her declarations, made directly adverse to this interest, could not be listened to in a court of justice. To stop to reason upon so bald a proposition seems to us like a waste of time. It is sufficient to refer to 1 Greenl. Ev., § 180.

All the testimony shows that she was on board the boat on which the supposed testator and his brother died when on their way from New Orleans to St. Louis. Two witnesses testify that she told them that in hunting up the things of the deceased brothers, after their death, she found a draft belonging to them. That after she got to St. Louis, she, with two men, tried to sell the draft, but could not. That, if they had sold the draft, she was to have gone up the river with them. That she had been a woman long enough. That when they found they could not sell the draft, then those men made the will in St. Louis. That she was affianced to Caspar, the brother of the supposed testator, at the time of his death.

Now this is the testimony, in open court, in opposition to the depositions of two witnesses who are said to reside in Missouri, and who purport to be the subscribing witnesses to the will, who testify that they saw the testator execute it as his will, and that one of them wrote it for him, and at his request, so soon as he was taken with his last sickness. In addition to this is the testimony of the father of the legatee, who says he was acquainted with the hand-writing of the testator and believes his signature to the will to be genuine.

There is undoubtedly a clear case of perjury on one side or the other of this case; and we are driven to the necessity of adopting the testimony of one set of witnesses and rejecting that of the other. And, by the rules of law, we should be inclined to believe those who prove the will to be genuine, rather than that it is a forgery. Yet, as strongly as we feel this inclination pressing upon us, all the surroundings of this case, and all the detail of circumstances shown by the record, constrain us to believe, and that, too, very clearly, that the legatee did make the statements testified to by the witnesses, and that the will was got up in St. Louis long after the death of the supposed testator. It is true, an attempt was made to impeach the credibility of one of the witnesses who testified to this conversation, but her character for truth and veracity was abundantly sustained.

We are of opinion that the judgment of the Circuit Court, reversing the order of the County Court admitting the will to probate, was correct, and that judgment must be affirmed.

*Judgment affirmed.*